STATE OF NORTH CAROLINA EX REL. UTILITIES COMMISSION;
DUKE POWER COMPANY, APPLICANT; CHEMSTRAND RE-
SEARCH CENTER, INC., NORTH CAROLINA CONSUMER'S
COUNCIL, INC.; NORTH CAROLINA PUBLIC INTEREST RE-
SEARCH GROUP; AND AFL-CIO OF NORTH CAROLINA; DUKE
UNIVERSITY, R. J. REYNOLDS TOBACCO COMPANY, INTER-
VENORS V. RUFUS L. EDMISTEN, ATTORNEY GENERAL AND GREAT
LAKES CARBON CORPORATION, INC., INTERVENORS

No. 7510UC109

(Filed 6 August 1975)

1. **Utilities Commission § 6— definition of rate — inclusion of formula**

The definition of "rate" contained in G.S. 62-3(24) is worded in
such a broad manner as to encompass the use of a formula, and the
fact that the formula must be computed each month does not render
it so imprecise as to be statutorily impermissible.

2. **Utilities Commission § 6— fuel adjustment clause formula — valid part
of rate or rate schedule**

The fuel adjustment clause formula used by Duke Power Com-
pany qualified as a valid part of a rate or rate schedule within the
meaning of Chapter 62 of the General Statutes.

3. **Utilities Commission § 6— adjustment of utility's rate schedule — pro-
cedure followed by Commission proper**

The Utilities Commission correctly followed the statutory pro-
cedure outlined in G.S. 62-134(b) where Duke Power Company filed
with the Commission on 30 November 1973 its request for a coal adjust-
ment clause and attached thereto schedules of the electric rates then on
file with the Commission and a schedule showing the coal clause for-
mula which it proposed to put into effect, Duke further requested that
the Commission allow the coal clause to become effective, pending hear-
ing and final determination, on bills rendered on and after 1 January
1974, and on 19 December 1973 the Commission entered an order per-
mitting the coal clause to go into effect on an interim basis on bills
rendered on and after 19 January 1974 and consolidated the case for
hearing with Duke's pending general rate increase application.

Judge MARTIN dissenting.

APPEAL by Great Lakes Carbon Corporation, Inc., and the
Attorney General, Intervenors, from an order of the North Caro-
lina Utilities Commission in Docket No. E-7, Sub 161, entered
on 10 October 1974. Heard in the Court of Appeals on 10 April
1975.

On 30 November 1973, Duke Power Company (Duke) filed
with the North Carolina Utilities Commission (Commission)
a proposed change in its rates and charges. This change was to

take the form of a coal cost adjustment clause (coal clause), which was to be added to each of Duke's retail electric schedules in North Carolina. An affidavit of Mr. B. B. Parker, Duke's Executive Vice-President, was filed along with this application.

On 19 December 1973, the Commission issued an order in Docket No. E-7, Sub 161, allowing the coal clause to go into effect on bills rendered on and after 19 January 1974. This order consolidated Docket No. E-7, Sub 161, with Duke's pending general rate increase application (Docket No. E-7, Sub 159) and in so doing stated: "All evidence heretofore presented in this matter is subject to cross-examination and further review before final disposition as a part of Docket E-7, Sub 159."

On 18 January 1974, the Attorney General, an intervenor in Docket No. E-7, Sub 159, filed notice of appeal and exceptions and a motion to postpone the order of 19 December 1973, pending judicial review, or in the alternative to rescind said order or to modify said order to provide for a refund with interest under bond. This motion was denied by the Commission on 31 January 1974, and the Attorney General appealed to this Court. Oral arguments were heard on 30 May 1974; and on 17 July 1974 this Court in *Morgan, Atty. General v. Power Co.*, 22 N.C. App. 497, 206 S.E. 2d 507 (1974) dismissed the appeal on the grounds that the order of 19 December 1973 was interlocutory in nature and not a final order from which an appeal could be taken. On 24 September 1974 our Supreme Court in a decision reported at 285 N.C. 759, 209 S.E. 2d 282 (1974) denied the petition of the Attorney General for a writ of certiorari and allowed motions of the Commission and Duke to dismiss the appeal.

While the appeal of the Attorney General was pending in this Court, the Commission upon its own motion reconsidered the application filed by Duke on 30 November 1973, which requested that the Commission, upon a hearing, approve a coal clause subject to refund as a part of Duke's rate schedule. In an order dated 16 April 1974 the Commission modified its order of 19 December 1973 to "provide for a refund with interest and Undertaking for refund pending final determination and Order in Docket No. E-7, Sub 161."

Public hearings in Docket No. E-7, Sub 159, and Docket No. E-7, Sub 161, were held for nineteen days between 28 May and 23 July 1974. Evidence was presented by Duke, the Commission, and Intervenors.

On 10 September 1974, the Commission issued an order which rescinded the refund provisions set forth in its order of 16 April 1974 and, pending a final order, confirmed all monies collected and to be collected by Duke pursuant to the coal clause.

On 10 October 1974 the Commission issued its final order in Docket No. E-7, Sub 161. The Commission made the following findings:

   1. The largest single item of expense for Duke in 1973 was fuel used for electric generation of which coal is the largest single item. During the test year, 1973, Duke spent approximately 104.6 million dollars for coal used in electric generation.

   2. Duke estimates its use of coal to be approximately 13 million tons in the generation of electricity during 1974.

   3. Duke's coal consumption for 1973 exceeded the consumption for 1972 by two (2%) percent. The cost of coal "as burned" for 1973, however, exceeded the cost of coal for 1972 by nine (9%) percent. The average price of coal increased from $10.35/ton to $11.26/ton, or from 43.94 cents per million Btu to 47.27 cents per million Btu.

   The monthly costs of coal "as burned" increased from 45.04 cents in January, 1973, to 52.56 cents in December, 1973, an increase of 17 percent. Coal received for the same period increased by 25 percent. The cost of coal "as burned" in March, 1974, was 76.90 cents, an increase of 46 percent over that in December, 1973.

   Coal as purchased for April, 1974, was 90.16 cents, an increase of 60 percent over December, 1973. Duke had projected an annual cost for 1974 of 77.7 cents with a monthly cost for April, 1974, of 88.6 cents. These sudden and drastic increases in the cost of coal used in steam electric generating stations have resulted in large increases in the cost of producing electric power. Such increases cannot be recovered in Duke's rate design without automatic adjustment for fuel costs without further deterioration of earnings before general rate cases can be filed, properly noticed and heard under the procedure for general rate cases.

   4. The demand for coal continually increases, while the production of coal decreases. The electric utility industry is

the single largest consumer of coal in the nation. The coal industry estimates a total consumption of coal of 659 million tons, of which 435 million will be consumed by the electric utilities. The drop in the production of coal appears to stem, in part, from certain laws and regulations. Duke has secured its coal at relatively favorable prices.

5. Duke has been unable to earn the return on its common stock equity found to be fair and reasonable by this Commission. This shortfall in earnings has been caused, in part, by the sharp rise in the cost of fuel. A continuing shortfall in earnings could result in higher rates to the customer and possibly jeopardize service. The higher rates to the customers would be engendered by an increased annual cost of funds raised to finance the plant facilities.

6. At present 194 electric utilities in 43 states have fuel adjustment clauses applicable to some class of service. To a large extent, coal, oil and gas are burned in the same plant facilities, and thus, a reasonable adjustment clause should include all fossil fuels. A fossil fuel clause would allow the pass-through of the increased cost of fuel in the monthly electric bill in an amount to reflect no more than the actual increase in the cost of fossil fuel over the base cost of the fossil fuel clause. Such a fuel clause must be administered so as not to increase the rate of return to Duke. The clause constitutes only a pass-through of the expense incurred by Duke in the production of each kilowatt hour of electricity in the form of a direct surcharge for each kilowatt hour consumed.

7. A "KWH" type of fuel clause, as opposed to a "Btu" type clause, adjusts for improvements in generation efficiency and appropriately passes any savings to the ratepayer.

8. A reasonable base cost in a fossil fuel cost adjustment clause amounts to .5037 (sic) [.5039] cents per kilowatt hour, which was the cost of fossil fuel for the month of October, 1973, using the average heat rate for the year 1973. This base cost is derived from the costs of fossil fuels shown on monthly reports filed with the Commission and is consistent with the level of rates approved by the Commission in Docket No. E-7, Sub 159.

9. In view of the circumstances surrounding the coal and substitute fossil fuel market, the fossil fuel adjustment clause is a reasonable method by which Duke can recover a part of its reasonable operating expenses.

The Commission made conclusions which except where quoted are summarized in part as follows:

(1) Price fluctuations in the price of fuel, an item of great expense to the utility, could seriously impair Duke's ability to earn the return set by the Commission as reasonable and fair.

(2) Duke's estimated need for thirteen million tons of coal to generate electricity during 1974 is reasonable.

(3) "[T]he cost of coal continues to spiral upward exceeding the estimated increases projected by the company."

(4) "Duke has been reasonably diligent in its coal procurement program and practices and . . . comparatively speaking, it has obtained what might be called favorable results, considering the altogether unfavorable condition of the coal market since the fall of 1973. These market forces to which we have alluded and with which Duke has had to deal are beyond the ability of either this Commission or Duke Power Company acting alone to control. Under these adverse and unfortunate circumstances, we are compelled to allow Duke to recoup such great increases in coal cost in a reasonably expeditious and orderly manner, for to do otherwise would imperil Duke's very existence."

(5) "[T]he substantial increase in the cost of coal has contributed to the shortfall in earnings experienced by Duke."

(6) A coal clause is an appropriate and well recognized method of recovering increased fuel costs. "[A] coal cost adjustment clause is insufficient in that such clause does not account for increases or decreases in costs in other fossil fuels, i.e., oil and gas . . . [and] a fossil fuel clause, i.e., a clause that would account for increases and decreases in costs of oil and gas, as well as in costs of coal, is more appropriate." Furthermore, "a monthly monitoring of fuel costs and resulting fuel adjustment factors will limit the possibility of Duke achieving earnings beyond a fair rate of return and will keep the Commission cognizant of the effect of the fuel clause on the ratepayers."

(7) The "savings resulting from improvements in genera-tion efficiency will automatically be passed on to the customers in the operation of the fossil fuel clause."

(8) "During 1973 Duke incurred a cost of coal significantly in excess of that recovered by Duke in the energy portion of the rates charged to its customers. In a fuel market in which there exists steadily increasing prices, Duke will continually experi-ence a shortfall in earnings in that rates designed without an adjustment clause will not permit Duke to recover the cost it incurs in purchasing fossil fuel. In light of these circumstances, a fossil fuel adjustment clause is a reasonable method of recover-ing the costs Duke incurs in its purchase of fuels.

[T]he cost of fossil fuel incurred by Duke is a reasonable operating expense to the extent that Duke acts in good faith in negotiating with suppliers and to the extent that Duke pays a fair and reasonable price for the fuels purchased.

[A] fossil fuel adjustment clause is a part of the rate to be fixed by the Commission pursuant to G.S. 62-133. The Com-mission further concludes that G.S. 62-133 (b) (5) directs the Commission to fix rates to be charged as will earn in addition to reasonable operating expenses the rate of return on the fair value of the property which produces a fair profit. Thus, the Commission concludes that for the purpose of approving a fossil fuel adjustment clause, the Commission need only determine whether the company's operating expenses are reasonable in that the clause will not increase Duke's rate of return, but will merely slow attrition of the rate of return. The rate of return on the fair value of the property used and useful in providing service has been determined in the general rate case, E-7, Sub 159, consolidated for hearing with this docket, E-7, Sub 161.

[A] system of monitoring the operating of the fossil fuel clause will insure that Duke acts in good faith in its negotia-tions, as well as protect the ratepayers of North Carolina from Duke recovering more through the fossil fuel clause than its reasonable operating expenses as they relate to cost of fossil fuels increase above the base cost in the fossil fuel clause."

Based on the foregoing findings and conclusions, the Com-mission ordered (1) that the fossil fuel adjustment clause be-come effective 1 November 1974, (2) that the coal clause remain in effect until 1 November 1974, (3) that Duke file with the Commission each month a complete Fossil Fuel Adjustment

668 COURT OF APPEALS [26

Clause Memorandum, and (4) that the motion of the Attorney General praying that the Commission reconsider or rescind its Order of 10 September 1974 be denied. From entry of the order of the Commission, Great Lakes Carbon Corporation, Inc., and the Attorney General appealed.

*Attorney General Rufus L. Edmisten and Deputy Attorney General I. Beverly Lake, Jr., for intervenor appellant Attorney General of North Carolina.*

*Byrd, Byrd, Ervin & Blanton, P.A., by Robert B. Byrd for intervenor appellant Great Lakes Carbon Corporation.*

*Steve C. Griffith, Jr., George W. Thorpe, and Kennedy, Covington, Lobdell & Hickman by Clarence W. Walker and John M. Murchison, Jr., for applicant appellee Duke Power Company.*

*Commission Attorney Edward B. Hipp and Associate Commission Attorney John R. Molm for appellee North Carolina Utilities Commission.*

HEDRICK, Judge.

While the Intervenors challenge the orders of 19 December 1973, 10 September 1974 and the final order of 10 October 1974 in various respects, the primary question for resolution on this appeal is whether a fuel adjustment clause is a valid device to be used in fixing the rate Duke can charge for its service as a public utility regulated by Chapter 62 of the General Statutes of North Carolina.

The fuel adjustment clause approved by the Commission in its 10 October 1974 order permits Duke to adjust its monthly bills for service by means of the use of a formula, which takes into consideration the cost of fossil fuel used to generate electric power. The clause is designed to pass through the increased cost of fossil fuel to the retail user in the form of a surcharge for each kilowatt hour consumed and is not designed to increase Duke's rate of return. As the cost of fossil fuel during the second month preceding the current billing month fluctuates above or below an established base cost of the fuel, the current bills of Duke's retail customers are increased or decreased per kilowatt hour billed by an amount determined by application of the formula.

In their brief, Intervenors review numerous sections of Chapter 62 which they argue will be abrogated if Duke is per-

mitted to implement a fuel adjustment clause. Specifically, Intervenors contend that it is the duty of the Commission "to fix or approve the PRECISE rates and charges, which are to be known quantitatively and . . . which will produce the precise amount of revenue which the Commission determines is necessary to cover the utility's cost of service and produce a fair return to its stockholders on its investment." A fuel adjustment formula, it is argued, cannot qualify as either a "rate" or "schedule of rates"; and by implementing the fuel clause, the Commission has permitted Duke to unilaterally change its rates from month to month without investigation or hearing and without the Commission otherwise taking into consideration those matters required by G.S. 62-133. Thus, the main thrust of Intervenors' argument is simply that the Commission has exceeded its delegated authority by using the fuel clause formula as a means of fixing rates.

Resolution of this question requires an examination of the applicable statutes in light of the following legislative policy, as declared in G.S. 62-2:

"*Declaration of policy.*—Upon investigation, it has been determined that the rates, services and operations of public utilities, as defined herein, are affected with the public interest and it is hereby declared to be the policy of the State of North Carolina to provide fair regulations of public utilities in the interest of the public, to promote the inherent advantage of regulated public utilities, to promote adequate, economical and efficient utility services to all of the citizens and residents of the State, to provide just and reasonable rates and charges for public utility services without unjust discrimination, undue preferences or advantages, or unfair or destructive competitive practices, to encourage and promote harmony between public utilities and their users, to foster a statewide planning and coordinating program to promote continued growth of economical public utility services, to cooperate with other states and with the federal government in promoting and coordinating interstate and intrastate public utility services, and to these ends, to vest authority in the Utilities Commission to regulate public utilities generally and their rates, services and operations, in the manner and in accordance with the policies set forth in this Chapter."

**[1, 2]**  Under Chapter 62 of the General Statutes, the Commission is given the power and the duty to fix just and reasonable rates for all public utilities subject to its jurisdiction. See, G.S. 62-32; G.S. 62-130. These rates are to be fair both to the public utility and to the customer. G.S. 62-133 (a).

G.S. 62-3 (24) defines a "rate" as follows:

> " 'Rate' means every compensation, charge, fare, tariff, schedule, toll, rental and classification, or any of them, demanded, observed, charged or collected by any public utility, for any service product or commodity offered by it to the public, and any rules, regulations, practices or contracts affecting any such compensation, charge, fare, tariff, schedule, toll, rental or classification."

It is our opinion that this definition is worded in such a broad manner as to encompass the use of a formula. Furthermore, the fact that the formula must be computed each month does not render it so imprecise as to be statutorily impermissible. In *City of Norfolk v. Virginia Electric and Power Co.*, 197 Va. 505, 516, 90 S.E. 2d 140, 148 (1955), wherein the Supreme Court of Appeals of Virginia upheld the authority of the State Corporation Commission to approve a "purchased gas adjustment provision" (an escalator clause), we find the following:

> "The proposed escalator clause is nothing more or less than a fixed rule under which future rates to be charged the public are determined. It is simply an addition of a mathematical formula to the filed schedules of the Company under which the rates and charges fluctuate as the wholesale cost of gas to the Company fluctuates. Hence, the resulting rates under the escalator clause are as firmly fixed as if they were stated in terms of money."

Likewise, from a reading of the decisions of our Supreme Court in *Utilities Commission v. Area Development, Inc.*, 257 N.C. 560, 126 S.E. 2d 325 (1962); *Utilities Comm. v. Light Co.*, 250 N.C. 421, 109 S.E. 2d 253 (1959), and *Utilities Commission v. Municipal Corporations*, 243 N.C. 193, 90 S.E. 2d 519 (1955), it appears that fuel clauses have been implemented by the Commission as a valid part of a utility's basic rate structure on several occasions in the past. We therefore conclude that the fuel adjustment clause formula qualifies as a valid part of a rate or rate schedule within the meaning of Chapter 62 of the General Statutes.

**[3]**   We must next consider, however, whether the Commission followed the proper procedure in implementing the fuel clause.

G.S. 62-134(b) provides:

> "Whenever there is filed with the Commission by any public utility any schedule stating a new or revised rate or rates, the Commission may, either upon complaint or upon its own initiative, upon reasonable notice, enter upon a hearing concerning the lawfulness of such rate or rates. Pending such hearing and the decision thereon, the Commission, upon filing with such schedule and delivering to the public utility affected thereby a statement in writing of its reasons therefor, may, at any time before they become effective, suspend the operation of such rate or rates, but not for a longer period than 270 days beyond the time when such rate or rates would otherwise go into effect. If the proceeding has not been concluded and an order made within the period of suspension, the proposed change of rate shall go into effect at the end of such period. After hearing, whether completed before or after the rate goes into effect, the Commission may make such order with respect thereto as would be proper in a proceeding instituted after it had become effective."

The record discloses that on 30 November 1973 Duke filed with the Commission its request for a coal adjustment clause and attached thereto schedules of the electric rates then on file with the Commission and a schedule showing the coal clause formula which it proposed to put into effect. Pursuant to G.S. 62-134(b), Duke further requested that the Commission allow the coal clause to become effective, pending hearing and final determination, on bills rendered on and after 1 January 1974. On 19 December 1973 the Commission entered an order permitting the coal clause to go into effect on an interim basis on bills rendered on and after 19 January 1974 and consolidated the case for hearing with Docket No. E-7, Sub 159, Duke's pending general rate increase application. In so doing, the Commission, in our opinion, correctly followed the statutory procedure outlined in G.S. 62-134. See *Utilities Comm. v. Morgan, Attorney General,* 16 N.C. App. 445, 192 S.E. 2d 842 (1972).

Intervenors excepted to the interlocutory orders of 19 December 1973 and 10 September 1974. They also excepted to various findings and conclusions made by the Commission in its

final order of 10 October 1974. We have carefully considered all of these exceptions and the arguments advanced by the Intervenors in support thereof. However, since all of these exceptions and contentions relate to the single issue of whether the Commission has the statutory authority to fix rates by means of a fossil fuel clause, no useful purpose will be served by any elaboration by us on these individual exceptions. Suffice it to say, we have carefully considered the entire record as presented and find it is sufficient to support the findings and conclusions made by the Commission, and these findings and conclusions support the order of 10 October 1974 which is

Affirmed.

Judge BRITT concurs.

Judge MARTIN dissents.

Judge MARTIN dissenting.

The action of the Commission, in undertaking to determine the issues in this case and to render its decision, without any notice or hearing, is directly in conflict with its statutory authority in Chapter 62 of the General Statutes. Consequently, the requirements of procedural due process have not been fulfilled in this case. The fact that the utility itself has no control over certain of its costs does not, under our law, justify its exemption from regular rate procedures. The exigency of the situation, however meritorious, is not enough to sustain a deviation from statutory requirements. For this reason I vote to reverse.