STATE OF NORTH CAROLINA EX REL. UTILITIES COMMISSION AND DUKE POWER COMPANY, APPLICANT v. RUFUS L. EDMISTEN, ATTORNEY GENERAL

No. 7610UC209

(Filed 18 August 1976)

**Utilities Commission § 6— fuel clause — no fixing of rates**

G.S. 62-136(a) authorizing the fixing of rates "to be *thereafter* observed and in force" refers to rate fixing as envisioned by G.S. 62-133 and not to the approval of a fuel clause designed to recover previously incurred costs; therefore, the Utilities Commission did not exceed its authority in entering an order allowing a power company to apply a temporary surcharge to recover its increased fuel costs incurred during two previous months while a prior fuel clause was in effect but not yet collected from its customers when such fuel clause was terminated by G.S. 62-134(e).

Judge MARTIN dissenting.

APPEAL by the Attorney General of North Carolina, on behalf of the Using and Consuming Public and State Agencies, from orders of the North Carolina Utilities Commission entered 27 August 1975 and 4 December 1975. Heard in the Court of Appeals 15 June 1976.

The order appealed from authorized Duke Power Company (Duke), on bills rendered on and after 1 September 1975, (1) to adjust its basic retail electric rates by the addition thereof of 0.4181 cent per kilowatt hour (KWH) based solely on increased fuel costs pursuant to G.S. 62-134(e) ; and (2) to apply a temporary surcharge, spread over a twelve months' period, designed to recover the unbilled revenues accrued as of 31 August 1975 as a result "of the lag in the old fuel adjustment clause on its North Carolina retail jurisdictional service." Proceedings leading up to entry of the order included the following:

On 29 June 1975 Duke filed an application with the Utilities Commission (Commission) pursuant to G.S. 62-134(e), material allegations of the application being summarized except where quoted as follows (numbering ours) :

(1) By order issued 10 October 1974 in Docket No. E-7, Sub. 161, the Commission approved the inclusion of a fossil fuel adjustment clause (fuel clause) in all of Duke's North Carolina retail rate schedules. Under said fuel clause the monthly charges in Duke's fossil fuel costs are reflected in its rates and charges to North Carolina retail customers in accordance with the formula set forth in the fuel clause.

(2) On 9 May 1975 the General Assembly enacted Chapter 243 of the 1975 Session Laws which, among other things, added a new subsection (e) to G.S. 62-134 as follows:

"(e) Notwithstanding the provisions of this Article, upon application by any public utility for permission and authority to increase its rates and charges based solely upon the increased cost of fuel used in the generation or production of electric power, the commission shall suspend such proposed increase for a period not to exceed 90 days beyond the date of filing of such application to increase rates. Upon motion of the commission or application of any person having an interest in said rate, the commission shall set for hearing any request for decrease in rates or charges based solely upon a decrease in the cost of fuel. The commission shall promptly investigate applications filed pursuant to provisions of this subsection and shall hold a public hearing within 30 days of the date of the filing of the application to consider such application, and shall base its order upon the record adduced at the hearing, such record to include all pertinent information available

to the commission at the time of hearing. The order responsive to an application shall be issued promptly by the commission but in no event later than 90 days from the date of filing of such application. A proceeding under this subsection shall not be considered a general rate case. All monthly fuel adjustment rate increases based solely upon the increased cost of fuel, as to each public utility, as presently approved by the commission shall fully terminate effective September 1, 1975, except that the same shall be earlier terminated as to each such public utility upon the effective date of any final order of the commission under this section; provided, however, that the termination date of September 1, 1975, shall not apply to any public utility which has filed an application under this subsection on or before July 1, 1975, and where the commission has not issued a final order by September 1, 1975. . . . "

(3) The purpose of this application is to accommodate Duke's rates and charges for North Carolina retail service, and rate schedules reflecting the same, to the change of law effected by G.S. 62-134(e).

(4) "Duke's present fuel clause contains a base of .5035 cent per KWH, which was derived from its fossil fuel cost in the month of October, 1973. This base of .5035 cent per KWH of generation is presently reflected in Duke's basic rates and charges for its retail customers in North Carolina. Since October of 1973, the fossil fuel costs of Duke have increased dramatically. Duke's fossil fuel cost for the month of May, 1975, was 1.1683 cent per KWH generated. Duke respectfully shows it cannot possible (sic) absorb the differential in the current cost of fossil fuel over and above the cost of .5035 cent per KWH reflected in its basic rates and charges. In order for Duke to continue to discharge its public utility obligation, it is necessary that it continue to recover these increased costs on a timely basis. Since G.S. 62-134(e) provides for the termination of the fuel clause, it is essential that Duke's basic rate schedules be changed to reflect the current cost of fossil fuel."

(5) "Duke proposes that an additional amount of .4326 cent per KWH be added in Duke's rates and charges as a result of the increased costs which it has actually incurred for fossil fuel used in the generation of electrical energy." (The application then goes on to set out detailed figures and other information upon which the requested increase is based.)

(6) "The fuel clause presently in effect permits Duke to recover the difference between the actual cost it occurs in generating electricity with fossil fuel and the cost (.5035 cent per KWH) which is presently recovered through its basic rates, which were approved by final order entered October 10, 1974, in Docket No. E-7, Sub 159. The recovery, however, is not made until the fuel adjustment factor is billed to Duke's North Carolina retail customers in the second month following the month in which the cost is incurred. The actual fuel cost to be recovered through the fuel clause is recorded on Duke's books and records as unbilled revenues in the month incurred, two months in advance of the time it is actually billed and recovered. This accounting treatment was approved by the Commission in its order of February 3, 1974, in Docket No. E-7, Sub 161. Accordingly, the fuel costs being billed and recovered by Duke during the month of June, 1975, are those costs that were actually incurred and recorded on its books as unbilled revenues during the month of April, 1975."

(7) "Upon the entry of an order by the Commission in this Docket pursuant to Duke's present Application filed under G.S. 62-134(e), Duke's fuel clause will terminate. At the time of such termination, Duke will have recorded on its books revenues for two months, but such revenues will be unbilled and uncollected. This unrecovered amount represents two forward months' billings on the presently effective fuel clause for expenses incurred in the most recent two months. These costs, which have not yet been determined but which are estimated to be in excess of $17,000,000, will be accrued but not collected by Duke unless recoverable under an order of the Commission. The recovery of these costs is necessary in order to comply with the Commission's accounting order of February 3, 1975. Furthermore, Duke cannot absorb these costs and continue to provide adequate service to its customers."

(8) "Duke therefore requests that it be permitted to recover the two months' fossil fuel costs which upon the effectiveness of an order issued by the Commission pursuant to this Application will be incurred but uncollected, over a 12 months period beginning with the effectiveness of an order issued herein, by amortizing the recovery in accordance with Temporary Rate Adjustment Rider No. 1, which is attached hereto as Exhibit 3."

On 3 July 1975 the Commssion entered an order suspending the proposed rates and scheduling a hearing on the application.

On 21 July 1975 the Commission entered an order allowing the Attorney General of North Carolina, representing the using and consuming public, to intervene as a party to the proceeding.

On 27 August 1975, following hearings at which oral and documentary evidence was presented, the Commission entered its order in which it found facts substantially as contended by Duke and made the following "CONCLUSIONS":

With the elimination of currently approved fuel adjustment charges from Duke's retail electric rates on September 1, 1975, pursuant to recently enacted N.C.G.S. 62-134(e), said rates will no longer be designed to fully recover fuel expenses incurred by Duke in providing electric utility service to its North Carolina retail customers. The basic rates currently in effect were designed to reflect fuel cost levels existing in October 1973. Current fuel costs are approximately double this level.

"Duke's basic retail electric rates should be adjusted by the addition of 0.4181 cent/KWH, said adjustment being based on generating and fuel cost statistics for June, 1975 and reflecting a reasonable estimate of the increase in fuel costs above those currently being recovered in Duke's basic rate design.

"Should generating and fuel cost statistics of subsequent months reflect fuel cost levels lower than those reflected in the adjusted basic rates, then Duke should immediately file for further adjustment to its rates to reflect these lower cost levels.

"Future filings for rate increases based solely on the cost of fuel pursuant to N.C.G.S. 62-134(e) can be reviewed more efficiently if such filings are based on Duke's current fuel adjustment formula using generating and fuel cost statistics in the third month preceding the billing month. This formula may be used to facilitate processing until such time as it may be modified in a general rate case. Duke should continue to file the monthly fuel adjutment charge report and the supporting monthly fuel cost and supply report to assist the Commission and the Staff monitoring fuel costs and their possible effects on future retail electric rates.

"With the elimination of the so-called 'automatic' fuel adjustment charge, Duke will have approximately

$17,000,000 of unbilled fuel charge revenues accrued because of accounting procedures that will become unrecoverable under existing rates. These unbilled revenues result from reasonable expenses incurred in the providing of electric utility service to North Carolina retail consumers and were accrued under accounting practices previously approved by this Commission. Duke should be allowed to recover these unbilled revenues by a surcharge designed to recover the total accrual over a period of twelve months.

"Accrual of unbilled revenues accounting to reflect the lag in recovery of increased fuel costs should be disallowed in the future. These practices were appropriate under an automatic fuel adjustment clause but are not appropriate for a rate case, either general or cost of fuel only.

"Bills after September 1, 1975 should show charges under the basic rate schedules and an 'approved fuel charge' separately. The approved fuel charge is effectively an adjustment to the basic rate to reflect changes in the cost of fuel and is stated separately only to facilitate individual customers in the computation and verification of their bills. The temporary surcharge designed to collect unbilled revenues may be included in the 'approved fuel charge' portion of the bill because of computer limitations."

The order then provided:

"IT IS, THEREFORE, ORDERED:

"1. That effective on bills rendered on and after September 1, 1975, Duke Power Company is hereby authorized to adjust its basic retail electric rates by the addition thereto of 0.4181 cent/KWH based solely on increased fuel costs pursuant to North Carolina G.S. 62-134(e).

"2. That following any decrease in fuel cost levels below those existing in the basic rates as adjusted for fuel cost increases, Duke Power Company shall immediately file for a downward adjustment to reflect these decreased fuel costs.

"3. That Duke Power Company shall continue to file on a monthly basis the computations of the fuel adjustment report and the supporting fuel cost and supply report.

"4. That effective on bills rendered on and after September 1, 1975, Duke Power Company is hereby authorized to apply a temporary surcharge designed to recover the unbilled revenues accrued as of August 31, 1975 as a result of the lag in the old fuel adjustment clause on its North Carolina retail jurisdictional service. The surcharge should be designed on a cent/KWH basis to recover the total deferral plus associated gross receipts taxes over a period of approximaetly twelve (12) months. The surcharge shall begin on September 1, 1975 and be terminated when the actual unbilled revenue total attributable to North Carolina retail jurisdictional service is recovered. Total dollar billings under this surcharge shall be reported to the Commission monthly.

"5. That accrued accounting of unbilled revenues due to the lag in the old fuel clause is no longer approved by this Commission and should hereby be eliminated in this jurisdiction.

"6. That bills after September 1, 1975 show the basic rate charges and 'approved fuel charges', so entitled, separately. The temporary surcharge may be included under the 'approved fuel charge'."

On 26 September 1975 the Attorney General filed exceptions to the order and notice of appeal. On 27 October 1975 Duke filed a report stating that the amount it billed during September 1975 under the surcharge provision totaled $1,506,930; and that the "actual amount of N. C. unbilled revenue at August 31, 1975 was $18,503,555." On 4 December 1975 the Commission entered an order affirming *in toto* its order of 27 August 1975 and overruling the exceptions filed by the Attorney General.

*Attorney General Edmisten, by Special Deputy Attorney General Robert P. Gruber, for appellant.*

*Commission Attorney Edward B. Hipp, and Assistant Commission Attorney John R. Molm, for North Carolina Utilities Commission, appellee.*

*Steve C. Griffith, Jr., George W. Ferguson, Jr., and Kennedy, Covington, Lobdell & Hickmen by Clarence W. Walker and John M. Murchison, Jr., for Duke Power Company, appellee.*

BRITT, Judge.

The Attorney General challenges that part of the Commission order allowing Duke to impose a temporary surcharge and states his contentions thusly:

"I. The Commission order approving a temporary surcharge allowing Duke to recover so-called unbilled revenues of $18,503,555 for fuel costs incurred in July and August, 1975 was illegal in that it fixed rates retroactively so as to make them collectible for past service.

"II. The Utilities Commission lacks the statutory authority to approve a temporary surcharge for the recovery of specific cost items experienced by a utility in the rendering of past service."

To understand the questions presented by this appeal, it is necessary to review briefly the history of the fuel adjustment clauses which the Commission has authorized Duke to impose. The problem sought to be solved dates back to 1973 when a worldwide energy crisis brought about tremendous increases in the cost of fossil fuels, particularly coal which is used extensively in this country in the generation of electricity.

On 30 November 1973 Duke filed with the Commission an application (Docket E-7, Sub. 161) for authority to adjust its retail electric rates and charges by the addition of a coal adjustment clause to be rendered on monthly bills on and after 1 January 1974. At that time Duke had pending an application (Docket E-7, Sub. 159) for a general rate increase.

On 19 December 1973, an order based on affidavits and other documentary evidence, the Commission consolidated the two applications and, pending a hearing, authorized the requested coal adjustment clause. The order provided that the clause would not be operative unless and until coal costs increased above the October 1973 level, and included the following:

"1. That effective on bills rendered on and after January 19, 1974 for service rendered on and after December 19, 1973 with respect to coal burned on and after November 1, 1973, the Applicant, Duke Power Company, is authorized and permitted to put into effect the coal cost adjustment clause attached to its application as Exhibit B.

"2. That Duke Power Company will report to the Commission on a monthly basis the amount of the fuel cost adjustment and the factors and computations used in its derivation."

On 17 July 1974 this court dismissed an appeal by the Attorney General from the 19 December 1973 order on the ground that the order was interlocutory. See opinion reported in 22 N.C. App. 497, 206 S.E. 2d 507; aff'd, 285 N.C. 759, 209 S.E. 2d 282 (1974).

On 10 October 1974, following lengthy hearings, the Commission entered a final order in Docket No. E-7, Sub. 161, in which it made pertinent findings of fact and conclusions of law and ordered (1) that the fossil fuel adjustment clause become effective 1 November 1974, (2) that the coal clause remain in effect until 1 November 1974, and (3) that Duke file with the Commission each month a complete fossil fuel adjustment clause memorandum.

The Attorney General and other intervenors appealed from the order, attacking the validity of the fuel adjustment clause. In an opinion filed 6 August 1975, and reported in 26 N.C. App. 662, 217 S.E. 2d 201, this court upheld the validity of the fuel clause. A fuller account of the findings and conclusions of the Commission is set forth in that opinion.

## SCOPE OF REVIEW

While our decision in this case does not rest on technical rules of procedure, we feel constrained to call attention to Rule 10 of the new North Carolina Rules of Appellate Procedure, 287 N.C. 671 (1975), which became effective with respect to all appeals taken from orders and judgments of trial tribunals, including the Utilities Commission, in which notice of appeal was given on and after 1 July 1975. Since the orders appealed from in the instant case were entered subsequent to that date, the new rules apply. Rule 10(a) provides:

"Function in Limiting Scope of Review. Except as otherwise provided in this Rule 10, the scope of review on appeal is confined to a consideration of those exceptions set out and made the basis of assignments of error in the record on appeal in accordance with this Rule 10. No exception not so set out may be made the basis of an assignment of error; and no exception so set out which is not made the

basis of an assignment of error may be considered on appeal. Provided, that upon any appeal duly taken from a final judgment any party to the appeal may present for review, by properly raising them in his brief, the questions whether the judgment is supported by the verdict or by the findings of fact and conclusions of law, whether the court had jurisdiction of the subject matter, and whether a criminal charge is sufficient in law, notwithstanding the absence of exceptions or assignments of error in the record on appeal. "

With respect to exceptions to findings of fact and conclusions of law, the last sentence of Rule 10(b)(2) provides "A separate exception shall be set out to the making or omission of each finding of fact or conclusion of law which is to be assigned as error." The drafting committee's commentary regarding this sentence, *Ibid*, p. 702, states: "The last sentence carries forward an established rule of decision which has prohibited 'broadside exceptions' to multiple findings or conclusions. *Logan v. Sprinkle,* 256 N.C. 41 (1961)."

All of the Attorney General's exceptions and assignments of error are to the signing and entry of the orders appealed from, with reasons given as to why the orders are invalid. In his assignment No. 5 (Ex. No. 3) as set forth in his grouping of exceptions and assignments, he alludes to "certain Findings and Conclusions" including one which he summarizes, and states that the findings and conclusions (presumably referring to all of them) are unsupported by competent, material and substantial evidence in view of the entire record as submitted, "and said Order is therefore arbitrary and capricious." Where the orders are set out in the record on appeal, no exception is noted to any finding of fact or conclusion of law.

We hold that there is no proper exception to the findings of fact and conclusions of law set forth in the orders, therefore, the findings and conclusions are presumed to be correct. Our review is limited to the questions whether the orders are supported by the findings of fact and conclusions of law.

### MERITS OF THE CASE

The main thrust of the Attorney General's contention is that the part of the 27 August 1975 order allowing Duke to apply a temporary surcharge to collect its increased fuel costs for July and August of 1975 constitutes retroactive rate fix-

ing which is not authorized by our statutes and has been declared illegal by our Supreme Court.

Specifically, the Attorney General argues that one of the primary statutes giving the Commission the authority to fix rates is G.S. 62-136, and that subsection (a) of that statute authorizes a fixing of rates "to be *thereafter* observed and in force" (emphasis ours). He further argues that in *Utilities Commission v. City of Durham,* 282 N.C. 308, 318, 193 S.E. 2d 95, 102 (1972), the Supreme Court declared that "the Commission may not fix rates retroactively so as to make them collectible for past service."

The Commission argues that there is a difference between rate fixing and approving a fuel clause designed to recover previously incurred costs. We find this argument persuasive.

Rate fixing contemplates considerably more than altering one component in the rate structure of a public utility. The catchline of G.S. 62-133 is "How rates fixed." The statute then provides that in fixing rates for certain public utilities (including power companies), the Commission, among other things, shall ascertain the fair value of the public utility's property used and useful in providing the service rendered to the public within this State, estimate the utility's revenue under present and proposed rates, ascertain the utility's reasonable operating expenses, and fix a rate of return on the fair value of the property as will enable the utility by sound management to produce a fair profit for its stockholders.

While the cost of fuel for its generating plants is undoubtedly a major expense item for Duke and other power companies, such cost is only one of many factors that G.S. 62-133 requires the Commission to consider in fixing rates. In *City of Norfolk v. Virginia Electric and Power Company,* 197 Va. 505, 90 S.E. 2d 140 (1955), the Virginia Supreme Court of Appeals, in approving a fuel clause (referred to by that court as an escalator clause) for a power company under its jurisdiction, recognized a distinction between rate fixing and approving a fuel clause. We quote from the opinion:

> "[T]he escalator clause is, therefore, highly remedial; it confers no benefit on the stockholders of the company except to help the avoidance of unjustified loss, and . . . it

likewise deprives them of the possibility of keeping an unjustified gain."

\* \* \*

"In approving the escalator clause the Commission did not fix rates retroactively, but on the contrary, it authorized and prescribed a fixed mathematical formula to be inserted in the schedules of the Company which will serve as a 'guide, direction, or rule or action' for determining future rates." 90 S.E. 2d at 146-48.

We think G.S. 62-136(a) refers to rate fixing as envisioned by G.S. 62-133. We also think the declaration by our Supreme Court in *Utilities Commission v. City of Durham, supra,* quoted above, was made in the context of a general rate fixing case and is not controlling in this case.

On 30 November 1973 when Duke applied to the Commission for authority to implement an automatic coal adjustment clause (also referred to herein as a fuel clause), it was operating within a rate structure that had been determined by the Commission pursuant to G.S. 62-133. That structure included an item of .5035 cent per KWH for cost of fossil fuel. The order of the Commission entered 19 December 1973 authorizing Duke to implement a fuel clause, which order is the root of the question presented by this appeal, did not "fix rates" but was only a means to make the .5035 cent per KWH for cost of fuel a workable figure from the standpoint of Duke and its customers.

By the enactment of Section 8 of Chapter 243 of the 1975 Session Laws [G.S. 62-134(e) quoted above], the General Assembly indicated an intent that the cost of fuel used in the generating of electricity by a public utility should be treated as a factor separate from all others in the utility's rate structure. The new statute expressly states that a proceeding under it shall not be considered a general rate case. It streamlines the procedure for considering an application to change the cost of fuel component and requires the Commission to rule on the application within 90 days after it is filed.

The record discloses that after October 1973 Duke could not determine the accurate cost of fuel per KWH for a given month until two months later, therefore, bills rendered in January 1974 included increased fuel costs for November 1973; that this caused a two months' lag in recovering the increased

fuel costs, thereby necessitating the surcharge in question to collect for July and August 1975.

While the 19 December 1973 and 10 October 1974 orders might have been clearer in their provisions that Duke's recovery of increased fuel costs would relate back to include November and December of 1973, a liberal construction of the orders leads us to conclude that they were sufficient to accomplish that purpose.

We hold that the Commission did not exceed its authority in entering the orders appealed from.

Affirmed.

Judge HEDRICK concurs.

Judge MARTIN dissents.

Judge MARTIN dissenting.

In fixing rates to be charged by a public utility, the Commission is exercising a function of the legislative branch of the government, and has only that power conferred upon it by G.S. Chapter 62. *Utilities Commission v. General Telephone Company of the Southeast,* 281 N.C. 318, 336 (1972).

G.S. 62-130(a) authorizes the Commission to fix rates, and G.S. 62-130(d) authorizes the Commission to revise and change rates from time to time as circumstances may require. G.S. 62-136(a) authorizes the Commission to investigate existing rates on its motion or upon complaint of anyone directly interested, and if the rates are found to be unjust and unreasonable, the Commission has the authority to determine the rates to be thereafter observed and in force. In investigating rates and setting rates for the future under the broad authority of G.S. 62-136(a), the legislature has given the Commission specific procedural and substantive guidelines to follow in fixing rates. G.S. 62-133 empowers the Commission to conduct a general rate hearing if the utility seeks an increase in rates which affects the entire rate structure of the utility. G.S. 62-73 and 74 allows a proceeding when the utility, a customer, or the Commission wishes to investigate a single rate or small part of the rate structure. *Utilities Commission v. Carolina Power and Light*

*Company,* 250 N.C. 421 (1959) ; *Utilities Commission v. Tide-water Natural Gas Company,* 259 N.C. 558 (1963). G.S. 62-134(e) provides for an investigation of a rate increase application based solely upon the increased cost of fuel. G.S. 62-137 requires the Commission to declare the scope of the hearing.

This Court has recently approved the use of a fuel escalator clause to set rates, stating that G.S. 62-3(24), which defines "rate" is worded in such a broad manner as to encompass the use of a formula. *Utilities Commission v. Edmisten, Attorney General,* 26 N.C. App. 662 (1975). I dissented in that case, and the question presented has not yet been decided by our Supreme Court. If it is assumed that a formula implemented under G.S. 62-3(24) is a valid rate making device, then G.S. 62-3(24) and the formula are subject to the limitations of G.S. 62-136(a).

When the statutes are viewed in harmony, and each is given its proper effect, it appears that whether rates are fixed under G.S. 62-133, G.S. 62-73, G.S. 62-74, G.S. 62-134(e), or G.S. 62-3(24) investigation and ordered change must be made under the umbrella of the authority given by G.S. 62-136(a) and G.S. 62-130.

A rate is fixed or allowed when it becomes effective pursuant to Chapter 62. G.S. 62-130(a). And rates must be fixed prospectively from their effective date. G.S. 62-136(a) provides that the Commission shall determine rates "to be thereafter observed and in force." This statute, which controls all rates set under G.S. Chapter 62, allows the Commission to set for a utility a reasonable rate for service to be rendered in the immediate future. The Commission may not fix rates retroactively so as to make them collectable for past service. *Utilities Commission v. City of Durham,* 282 N.C. 308, 318 (1972) ; *Utilities Commission v. Morgan,* 277 N.C. 255, 267 (1970). See *Public Utilities Commission v. United Fuel Gas Co.,* 317 U.S. 456, 464, 87 L.Ed. 396, 63 S.Ct. 369.

In a general rate case conducted pursuant to G.S. 62-133, a utility's historical costs and earnings during a proscribed test period must be considered. The test period operating experience of the utility must be adjudged pro forma to account for all known changes and conditions affecting revenues and expenses so that the test period will accurately reflect the immediate future. Thus specific expense items which occurred in the past are not calculated so that they may be actually recovered by future

rates. They are calculated only to be used as the most reasonable estimate of what the company may anticipate in the future.

The use of historical operating data to set rates for the future is not limited to setting rates under G.S. 62-133 when a test period is used. It applies to setting rates under any other proceeding or rate making device used in North Carolina. These principles apply to the use of an automatic fuel adjustment clause as well as to nonautomatic procedures.

Thus, a fuel clause is a prospective device—it sets rates for the future. The fuel clause applied in any given month, could not be applied retroactively to collect past fuel costs, incurred in rendering service prior to the effective date of the fuel clause, although billings rendered under the fuel clause were based on actual past costs. Billings under the fuel clause were intended to collect fuel costs in the months billings were rendered and the costs two months prior to the billings were used in the billing month as a proxy for the actual costs in the most current months. This procedure is the same in principle as applied in setting rates under G.S. 62-133.

When the fuel clause or coal clause was initially approved on December 19, 1973, as a result of Duke's application filed on November 30, 1973, legally it had to operate prospectively on and after December 19, 1973. Although burned coal costs on and after November 1, 1973 were used as the best estimate of or cost proxy for billings on and after January 19, 1974, Duke could not be allowed to recover its burned costs prior to that date. To have allowed the coal clause to recover coal costs burned on and after November 1, 1973, would have been the clearest example of retroactive rate making. *Utilities Commission v. Morgan, Attorney General, supra.* G.S. 62-136(a). The November, 1973 burned costs were simply used as the best estimate of costs to be billed from January 19, 1974 to February 19, 1974. Since the coal clause at its inception was prospective, no legally recoverable two months lag arose.

The critical factor is that the $18,503,555 in fuel costs were costs incurred in rendering service prior to the effective date of the Commission order of August 27, 1975, and the Commission acted in excess of its statutory authority by allowing these costs to be recovered retroactively. The surcharge is an illegal rate or charge for services rendered in the past. The Commission had no authority to go back and set rates for serv-

ices rendered in July and August, 1975, in order to recover unbilled revenues. G.S. 62-136 (a), *Utilities Commission v. Morgan, Attorney General, supra.*

G.S. 62-134 (e) only allows for recovery of increased cost of fuel used in the generation or production of electric power. There is no increased cost of fuel on and after September 1, 1975, involved in the costs being recovered under the temporary surcharge. These are past non-recurring expenses incurred for past service prior to the issuance of the Commissioner's order in this case. Further, G.S. 62-134 (e) plainly prohibits attempts to carry the old fuel clause forward past September 1, 1975, and this is precisely what the Commission has attempted to do through its approval of the temporary surcharge. The Commission totally lacks statutory authority or jurisdiction to approve the temporary surcharge.

I vote to reverse.