In the Matter of the Application of KAUAI ELECTRIC
DIVISION OF CITIZENS UTILITIES COMPANY
For Approval of a Proposed Revision in Rates

NO. 6178

DECEMBER 19, 1978

RICHARDSON, C.J., KOBAYASHI,
OGATA, MENOR AND KIDWELL, JJ.

OPINION OF THE COURT BY KOBAYASHI, J.

This is an appeal by Kauai County, intervenor (appellant), from order numbers 3852, 4084, and 4083, issued by the state

Public Utilities Commission (Commission) in the application of the Kauai Electric Division of Citizens Utilities Company (hereinafter referred to as applicant)[1] for interim and permanent rate increases in electric tariff schedules for four categories of consumers: residential, general light and power, street lighting, and large power; and for substitution of an "energy rate adjustment clause" for the current fuel oil clause. Order number 3852 approved an interim rate increase, effective February 17, 1975, and order number 4084 approved a permanent rate increase effective on or after the date of the order, December 11, 1975. Order number 4083 denied motions filed by the Public Utilities Division of the State Department of Regulatory Agencies (hereinafter referred to as the PUD), and appellant to set aside submission of the case, set aside the interim rate increase and to reopen the case for further taking of evidence.

## ISSUES

I. Whether order number 3852 is void because:

A. The Commission has no power to issue interim orders, or, if it does have such power, the power constitutes an impermissible delegation of legislative power;

B. The Commission failed to hold a "full hearing" as required by HRS § 91-9;

C. It lacks specific findings of fact and conclusions of law as required by HRS § 91-12;

II. Whether order number 4084 is void because the ultimate conclusions reached by the Commission are unsupported by reliable, probative and substantial evidence;

III. Whether the energy clause is void.

IV. Whether denial of appellant's motion to reopen the proceedings denied the consumer a fair hearing.

---

[1] Citizens Utilities Company, the parent company to applicant, has its administrative and corporate headquarters in Stamford, Connecticut, and operates gas, electric. telephone, and water services in ten states.

## STATEMENT OF THE CASE

In an application filed on November 9, 1973, and docketed as No. 2402 (hereinafter referred to as the November 9th application), applicant, an operating public utility engaged in the production, transmission, distribution and sale of electric energy for domestic, commercial, industrial, agricultural and governmental purposes on the Island of Kauai, State of Hawaii, submitted proposed rate schedules for approval. The proposed schedules effected an increase in base rates charged to residential, general light and power, street lighting, and large power consumers,[2] and proposed a new "energy rate adjustment clause" as a replacement for the fuel oil clause.[3] The application requested approval to implement interim rate increases pending final approval of permanent increases, subject to refund to consumers.

On February 25, 1974, the applicant filed a motion requesting approval of electric tariff schedules equal to the proposed interim rates, including the energy rate adjustment clause.[4] The motion proposed a base amount of $0.0113834

---

[2] The proposal requested a 20% increase in base rates chargeable to residential, general light and power, and street lighting consumers, and a 45% increase in base rates chargeable to large power consumers.

[3] The applicant's fuel oil clause was approved by the Commission in a prior rate proceeding, Docket No. 1817, and made effective as of September 1, 1970, it being the same clause in existence since 1958.

The fuel oil clause for residential consumers read as follows:

Fuel Oil Clause:

The above base rates are based upon a posted price for plant delivery of Three Dollars ($3.00) per barrel for standard bunker fuel oil. When said price of fuel oil is in excess of, or lower than $3.00 per barrel, there shall be a corresponding increase or decrease in the above rates. Such increase or decrease shall be in the amount of $0.00035 per kwh for each full Ten-Cent (10c) increase or decrease above or below $3.00 per barrel. The revision in the effective rates following a change in said price of fuel oil, in accordance with the preceding clause, shall be made on and after the first day of the month following such change in the price of fuel oil.

[4] The applicant proposed a 35% surcharge for large power service consumers, and a 15% surcharge for residential, general light and power, and street lighting consumers.

per kilowatt hour (kwh) as the energy rate adjustment to be applied to all rates, on a monthly basis.

On March 12, 1974, the Commission, on its own initiative, issued order no. 3439 on docket no. 2402, ordering the applicant to show cause why a further reduction in the fuel oil clause should not be made. At a hearing on March 15, 1974 and April 16, 1974 the Commission heard testimony regarding applicant's proposal to substitute its energy rate adjustment clause for the fuel oil clause. The Commission also heard the testimony of Mr. LeRoy Yuen, Acting Executive Director of the PUD, as to the PUD's proposal for an alternative energy clause.[5] Mr. Yuen explained the PUD's proposal in this way:

> What we have done is to take the *cost of fuel for power generated by the company and the purchased power* that was obtained from the plantations at that time. [The "time" refers to the time of the hearing on Docket No. 1817.] We also took the estimated kilowatt hours in the Decision and Order [No. 1817] and arrived at a figure of 6.93 mils as the base price of fuel that *should have been* used in the fuel oil clause. We have restated the fuel oil clause similar to what the company is proposing, however, the figures are different.
>
> .   .   .   .
>
> What we are proposing is that the base price of fuel which we have calculated to be 6.93 mils be the take-off point for any increase or decrease in the rates charged to Kauai consumers. *This figure is the weighted cost taken*

---

[5] The PUD's proposed energy adjustment clause read as follows:

The Base Rates shown above are based on a fuel cost of six and ninety-three mils (6.93 Mils) per KWH. When the fuel cost per KWH is more or less than 6.93 mils, there shall be a corresponding increase or decrease in the above rates.

The Base Rates shall be increased or decreased 0.20 of a cent per KWH for each full one-fifth cent (0.20¢) increase or decrease in the fuel cost. The cost of fuel oil and purchased power prevailing on the 15th day of the calendar month shall be used in computing the fuel cost. Changes in rates become effective on billing commencing on the first of the month following the change in fuel cost.

*into consideration the purchased power and those powers generated from steam and diesel.* (Emphasis added.)[6]

At this meeting Kauai County was given permission to intervene in the proceedings.

On March 27, 1974, the applicant filed an amended application stating that the November 9th application rate schedules were erroneously based on a fuel cost of $3.00 per barrel rather than the $4.47 per barrel. According to the applicant, the amendment did not alter the percentage increases in the base rates which were proposed in its November 9th application. The proposed energy rate adjustment clause and the tax adjustment clause also remained the same.

At a hearing on April 16, 1974 at 7:00 p.m., the Commission ordered the applicant to adopt the PUD's proposed energy clause[7] and denied applicant's February 25, 1974 motion for interim rates and applicant's proposed energy rate adjustment clause.[8] Although the record does not show that a

---

[6] We conclude from the testimony of Mr. Yuen that the PUD's proposed energy clause differed from the fuel oil clause made effective by the Commission in docket No. 1817. The proposed clause took into consideration the cost of purchased energy and diesel fuel, altered the base price of fuel by using the current $4.47 per barrel price for bunker C fuel, and implemented a 0.20¢ barrier to increases and decreases in fuel cost charged to the consumer. The fuel oil clause of docket No. 1817 utilized a $3.00 per barrel cost for bunker C fuel oil and used a set dollar amount to be charged to the consumer where the cost of fuel rose or declined in the amount of 10¢ per barrel.

[7] See n. 5, *supra*.

[8] The record does not contain minutes of that meeting. However, at the public hearing held by the PUC on April 16, 1974, at 7:00 P.M., the Chairman made the following statement, at page 3:

Before we proceed, I would like to announce for the group here, at the insistence of your Kauai Commissioner Henry Gomez earlier this evening, the Commission unanimously adopted a motion by Commissioner Gomez denying its application dated February 25, 1974 and April 3, 1974, seeking a revision of the fuel oil clause. *And further orders Kauai Electric Company to adopt the Staff's proposal of fuel oil adjustment clause on the Commission's order to show cause retroactively to April 1, 1974.* This fuel oil clause is similar to that used by other utilities in this State and will result in a rate approximately 15 percent lower than the rate proposed by Kauai Electric Company. (Emphasis added.)

Although the chairman used the term "fuel oil adjustment clause", the clause referred to is the *same clause* some times referred to as the "energy adjustment clause" and "energy rate adjustment clause".

formal written order was issued implementing the PUD's new energy clause into the applicant's rate schedules, the record reveals that the applicant was notified in writing of the Commission's decision in a letter dated May 1, 1974.[9] The record shows that the applicant informed the Commission by letter dated April 18, 1974, that it had implemented the proposed energy clause as ordered by the Commission.

On May 31, 1974, the Commission held a prehearing conference with the parties at which time it was agreed that the "test year" for purposes of the rate proceedings would be the 1975 calendar year.

The rate hearings on the November 9th application, as amended, began on September 17-20, 1974, and continued on October 24-25, 1974, February 12, 1975, and June 25, 1975. The applicant presented its case for its proposed rate increases and the need for a new energy adjustment clause to replace the fuel oil clause. The applicant amended its proposed energy rate adjustment clause to provide for a pass-through to the consumer of increases in taxes resulting from an increase in revenues due to increases in fuel costs.[10]

Testimony from several experts was received on the issue of a fair rate of return for applicant. Walter A. Morton, economist, testified for the applicant that in his opinion and according to his calculation, a fair rate of return would be

---

[9] HRS § 269-15 (1955) (current version at HRS § 269-15, 1976) provides in relevant part:

   If the public utilities commission is of the opinion that . . . any rates, fares, classifications, charges, or rules are unreasonable or unreasonably discriminatory . . . it shall in writing inform the public utility of its conclusions and recommendations. . . .

[10] Applicant made the following addition to paragraph 2 of its proposed energy rate adjustment clause:

   The difference between the amount computed in accordance with paragraphs 3 and 4 below and 6.93 mills per KWH, *increased by the amount of all taxes based on revenues*, shall become effective on billings rendered by the Company on the 10th of the month following the change in energy cost. (The underlined clause indicates the additional language.)

somewhere between 10.3% and 10.9%.[11] Otto Bixler, a consultant-engineer retained by the County to study factors relating to present consumer cost of electric power on Kauai, testified that since Citizens Utilities Company had been successful in selling their stock and reinvesting their earnings in their company, the 6.5% rate of return granted to the applicant in the prior rate hearing was adequate to meet the applicant's needs.

Harold N. Honda, Chief Financial Analyst for the PUD, testified that, after reviewing all areas considered relevant to a determination of a fair rate of return, 9% would constitute a fair rate of return applied against an "original cost" rate base.

The PUD's proposal to increase the tariff schedules was presented by Gaylord H. Ching, a research statistician with the PUD. Regarding the applicant's proposed changes in rate schedules, Mr. Ching testified that although the applicant's November 9th application requested a 20% increase in base rates for residential, general light and power, and street lighting services consumers, and a 45% increase for large power services, the March 27, 1974, amended application increased the base rates for residential, general light and power, and street lighting services to 26%-48% above present rates, and for large power services, to 45%-109% above present rates. The applicant's proposal would result in a 32.5% increase in total revenues to the applicant, an increase of $2,663,300 over present revenues. In regard to the applicant's proposed energy rate adjustment clause, Mr. Ching suggested that: (1) the 0.2¢ factor for fuel adjustment be retained so that the applicant would be encouraged to economize and bargain hard for purchase of materials and supplies; (2) that paragraph 4 of the applicant's proposal relative to the applicant's generating

---

[11] Morton testified that, since applicant had no capital structure of its own, he based his calculations for applicant on the capital structure of Citizens Utilities Company, and alternatively, on a hypothetical capitalization of 50% debt and 50% equity. Morton defined fair rate of return as that percentage, which when multiplied by the rate base (i.e. the present value of plant equipment minus depreciation) results in a fair return (i.e. the number of dollars of earned income required to meet the financial needs of the company.)

capacity adjustment provision be denied; (3) that the tax adjustment clause not be permitted; (4) that the applicant's proposed base rates as requested in its amended application be increased by a factor of $.01360 per kwh to account for the current increase in fuel oil price from $4.47 per barrel to $12.00 per barrel.[12] Mr. Ching testified that the PUD's proposal would result in a 23.4% increase in projected revenues for the applicant, an increase of $1,882,600 over revenues collected at present rates.

On November 27, 1974, the PUD petitioned the Commission to have the submission of the case set aside and to reopen

---

[12] The PUD's proposal was based on an energy cost of $0.02444 per kwh as of June 30, 1974, computed by dividing the total cost of energy as estimated by Robert F. Walden, PUD's witness, including the cost of Bunker "C" fuel oil, diesel fuel, and purchased power (for a total of $3,401,066), divided by the PUD's projected energy sales of 139,142,000 kwh. The PUD's proposal for residential consumers was as follows:

Energy Rate Adjustment Clause:

1. The Rates shown above are based on an energy cost of twenty-four and forty-four hundredth mills (24.44 Mills) per KWH. When the energy cost per KWH is more or less than 24.44 mills, there shall be a corresponding increase or decrease in the above rates.

2. The above Rates shall be increased or decreased 0.20 of a cent per KWH for each full one-fifth cent (0.20¢) increase or decrease billings rendered by the Company on the 10th of the month following the change in energy cost.

3. Prior to the 10th day of each calendar month, the Company shall make the following computation as of the last day of the preceding month: Divide (A) the sum of the repriced cost of energy included in Account 555 for the twelve-month period ending on the computation date plus the repriced cost of fuel included in Accounts 501 and 547 for the same period, all repriced at price levels charged the Company for such energy as of the computation date and fuels as of the 15th day of the calendar month, by (B) the total KWH sold by the Company included in Accounts 440 through 448 for the same period. The difference between the amount so computed and the base amount shall be the energy cost.

This clause does not differ significantly from the clause implemented by the Commission at its April 16, 1974 quorum meeting. The only changes made by Mr. Ching's proposal to that of April 16, 1974 were: (1) the cost per KWH for energy was increased due to the increase in the cost of bunker C and diesel fuel as of June 30, 1974 (the date used by PUD to establish the cost of energy); and (2) the time and method of computing changes in energy cost was modified to conform to the method requested by the applicant.

the proceedings for additional evidence. Petitioner alleged that applicant had failed to comply with the Commission's request for: (1) certified audited statements of Kauai Electric Company accounts by an independent audit firm for the year 1973; and (2) the rate of return on invested capital for Citizens Utilities Company, showing each division and subsidiary corporation separately. The petition requested that a further hearing be scheduled and the submission of brief and proposed decision and order be delayed. On December 5, 1974, Kauai County filed a joinder in the PUD's motion.

Subsequent to PUD's November 27th petition, the Commission on December 19th held a special quorum meeting at which time the applicant was ordered to provide written explanation of the adjustments for unallocated income items for the years 1969 through 1973 by January 3, 1975. In a letter dated December 19, 1975, the Commission requested the applicant to submit a written explanation of the unallocated income for the years 1969 to 1973 and on January 3, 1975, applicant complied with the request. The Commission determined that the applicant's responses to these requests were satisfactory.

At the February 12, 1975, hearing, the Commission heard arguments by the parties on the November 27th motion. Appellant strenuously criticized the reliability of the figures presented by the applicant primarily because no audit of Kauai Electric division as a separate entity from the present Citizens Utilities Company had been presented. The company stated that no such separate audit statement existed. The motion was orally denied. Immediately thereafter Commissioner Gomez made the following motion:

> Yes, Mr. Chairman. I move that Kauai Electric Division of Citizens Utilities be granted an interim increase based primarily on Staff's [PUD's] Exhibit F. According to Staff Exhibit F, the Staff arrived at a rate base of $17,369,800. Staff also proposd a rate schedule which was attached to Gaylord Ching's testimony on pages 47 through 54. Mr. Ching in his oral testimony changed his

figures on page 47 from $3.15 to $3.49 with a minimum of $3.49 and also changes his figures on page 49 from $3.76 to $4.10 with a minimum of $4.10. The changes are shown on page 302 of the transcript. According to Exhibit F, the rate schedule proposed by Mr. Ching would produce a fair rate of return of 8.5%. The effective date, Mr. Chairman, I would recommend February 17, 1975.

The motion was carried by a unanimous vote. The Commission stated that the interim rate increase was not final and subject to refunds to customers if the Commission decided on an "adjustment downward." The applicant's proposed clause to recover taxes generated by the oil clause revenues were included in the approval. On March 21, 1975, the Commission filed order number 3852, which stated in its entirety:

The Commission being fully advised by reason of hearings held on the Island of Kauai at various times and pursuant to the unanimous vote in the affirmative at meetings held on February 12 and 27, 1975,

IT IS HEREBY ORDERED that Kauai Electric, a division of Citizens Utilities, be and is hereby granted an interim increase in the rates it may charge its customers, based on the rate schedule designed by Gaylord H. Ching as shown on pages 47 through 54, inclusive, on the attachment to his written testimony, as amended by his oral testimony.

The effective date of this interim increase is February 12, 1975.

The Commission made no separate findings of fact and conclusions of law nor did it incorporate any proposed findings in its order.

On March 31, 1975, Kauai County filed a petition to set aside the interim rate increase and to reopen the proceedings for the taking of additional evidence.

On June 25, 1975, the Commission held a hearing at which time oral arguments presented by the applicant, the PUD, and Kauai County were heard. On December 11, 1975, the Commission issued Order No. 4083 denying the County's March motion. On the same day, the Commission filed its Decision and Order No. 4084, Findings of Fact and Conclu-

sions of Law. Regarding its decision as to the rate schedules, the Commission said:

Since the ultimate effect of this decision is the granting of an increase exactly the same as that granted as an interim measure by Order No. 3852, filed on March 21, 1975, effective February 17, 1975, the rate schedules adopted pursuant to that Order are hereby adopted as the permanent schedules for the purposes of this case.

Included in the new rate schedules is a provision to enable the Applicant to recover taxes payable by reason of additional revenue generated by the fuel clause. That too shall become a part of the permanent schedules.

The Applicant proposed two changes in the *existing fuel clause*. One is the elimination of the provision whereby the increase or decrease in the fuel cost is not reflected in the bill to the consumers until the change is 2 mills or more. The proposal by the Applicant is to eliminate the 2-mill barrier and to pass on to the consumers the actual increase or decrease at each billing. The other is to use a lower figure as the base cost of fuel in lieu of the 24.44 mills now being used. The Applicant contends that the lower figure would clearly show the consumers the fact that the high electric bill is the result of high oil prices and not the fault of the Commission or the Applicant. Both proposals have merit. But since they are novel in concept, they require further study. The Commission will retain the 2-mill barrier and use 24.44 mills as the base cost, but will entertain changes that may be proposed by the Applicant and the PUD by agreement. To that end it is urged that they meet and come up with the desired changes for consideration by the Commission.

The Applicant also proposed automatic changes in rates in the event (1) it installs new generation facilities, and (2) there are changes in taxes. If the proposal is adopted, this Commission would be agreeing to changes without knowing the justification therefor, thereby abdicating its duty to regulate rates. Therefore, the proposal

is denied. (Emphasis added.)[13]

The Commission made, *inter alia*, the following ultimate findings:

. . . .

3. The depreciated average rate base for the test year is $17,374,400.

4. A fair rate of return on its rate base for the Applicant is 8.94%.

5. The Applicant has asked for and is entitled to a rate increase, effective as of the date of this Order, which will produce an annual sales revenue increase of $1,949,000.

6. The new rate schedules attached hereto as Exhibit "C" and made a part hereof and the rates and charges therein are just and reasonable and will provide a fair rate of return on the property of the Applicant actually used or useful for public utility purposes.

Order No. 4084 made no further disposition relative to the final status of interim Order No. 3852. The Commission denied granting applicant the proposed automatic changes in rates due to increases in generating facilities or changes occurring in taxes chargeable to the applicant. The Commission further decided to retain in the energy rate adjustment clause the 2-mill barrier to passing-on increases and decreases in energy cost, effective pursuant to Order No. 3852, and the use of 24.44 mills as the base cost.

OPINION

I. ORDER NO. 3852

A. WHETHER ORDER NUMBER 3852 IS VOID BECAUSE THE COMMISSION HAD NO POWER TO ISSUE INTERIM ORDERS, OR IF IT DOES HAVE SUCH POWER, THE POWER CONSTITUTES AN IMPERMISSIBLE DELEGATION OF LEGISLATIVE POWER

---

[13] The record indicates that "existing fuel clause" referred to by the Commission was the clause made effective as of April 1, 1974, at the April 16, 1974, quorum meeting and not the fuel oil clause approved in docket No. 1817.

HRS § 269-16 (1973) (amended 1976)[14] provides in relevant part:

> All rates, fare, charges, classification, schedule, rules, and practices made, charged, or observed by any public utility . . . shall be just and reasonable . . . . The commission shall not approve any increase in rates without conducting an advertised public hearing or hearings thereon on the island on which the utility is situated. No rate shall be increased nor shall any hearing be held unless notice of the hearing . . . has been advertised . . . . The commission, upon notice to the public utility, may suspend the operation of any proposed rate, fare, charge, classification, schedule, rule, or practice or any proposed abandonment or modification thereof or departure therefrom and after a hearing by order regulate, fix, and charge all such rates, fares . . . so that the same shall be just and reasonable, . . . regulate the return upon its public utility property, the incurring of indebtedness, relating to its public utility business, and its financial transactions, *and do all things in addition which are necessary and in exercise of such power and jurisdiction, all of which* as so ordered, regulated, fixed and charged *shall be just and reasonable*, and such shall provide a fair return on the property of the utility actually used or useful for public utilities purposes . . . . (Emphasis added.)

The language of the statute grants to the Commission broad discretionary power in the area of rate regulation, providing that the procedural mandates of notice and public hearings are met, and providing that rates set are "just and reasonable." There is nothing in the statute which evidences a legislative purpose to confine the Commission to making final orders only. *See City of Stuttgart v. Arkansas Power & Light Co.*, 5 P.U.R. (N.S.) 161 (1934). Other jurisdictions

---

[14] The amended version of HRS § 269-16(c), which was not effective at the time of the hearings, expressly authorizes the Commission to order temporary increase in rates, fares, and charges upon a finding by the Commission of "probable entitlement and financial need."

have held that the power to issue interim orders is necessarily implied from the express ratemaking power granted to public utilities commissions. *State ex rel. Utilities Commission v. Edmisten,* 26 N.C.App. 662, 217 S.E.2d 201 (1975); *Chesapeake & Potomac Telephone Co. v. Public Service Commission,* 330 A.2d 236 (D.C.App. 1974); *Southern Bell Telephone & Telegraph Co. v. Bevis,* 279 So.2d 285 (Fla. 1973); *State ex rel. Puget Sound Navigation Co. v. Department of Transportation of Washington,* 33 Wash.2d 448, 206 P.2d 456 (1949); *American Indian Oil & Gas Co. v. George F. Collins & Co.,* 157 Okl. 49, 9 P.2d 438 (1932); *Oklahoma Gas & Electric Co. v. State Corporation Commission,* 83 Okl. 281, 201 P. 505 (1921). *Contra, City of Pittsburgh v. Pennsylvania Public Utility Commission,* 171 Pa.Super. 391, 90 A.2d 850 (1952). Some jurisdictions have implied the commission's authority to issue interim orders from the express power to suspend rates. *Trans Alaska Pipeline Rate Cases,* 436 U.S. 631 (1978), where the court cited *United States v. Chesapeake & Ohio Railway Co.,* 426 U.S. 500 (1976), for the proposition that incident to an express authority to suspend proposed tariffs, the FCC was empowered to exercise powers which were a "legitimate, reasonable, and direct adjunct" to an explicit statutory authority.

In our opinion, the Commission's authority to grant interim rate increases conditioned on a refund provision is necessarily implied from the express authority to regulate rates and supervise public utilities operating within the State, *see In re Hawaiian Telephone Co.,* 54 Haw. 663, 513 P.2d 1376 (1973), and is to be implied from the express authority granted the Commission under HRS § 269-16 to "do all things . . . which are necessary and in exercise of such power and jurisdiction . . . all of which shall be just and reasonable." *See Chesapeake & Potomac Telephone Co. v. Public Service Commission, supra; American Smelting and Refining Co. v. Federal Power Commission,* 494 F.2d 925 (D.C.Cir. 1974), *cf. Sixty Wall Tower, Inc. v. Public Service Commission,* 12 A.D.2d 853, 209 N.Y.S.2d 688 (1961).

Appellant argues that if the Commission has authority to grant interim orders, the authority is unconstitutional be-

cause the standards for exercising that power are lacking. Appellant cites *A.L.A. Schechter Poultry Corporation v. United States*, 295 U.S. 495 (1935), and *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935), for support.

While this jurisdiction has adopted the non-delegation doctrine as part of its own body of constitutional law, *State v. Willburn*, 49 Haw. 651, 426 P.2d 626 (1967), the *Schechter* and *Panama Refining Co.* cases are inapposite.

Unlike the unlimited authority delegated by Congress to the President in the *Panama Refining Co.* and *Schechter Corporation* cases, our statute, HRS Chapter 269, prescribes the powers and duties of the Commission, and subjects the Commission's proceeding to appropriate administrative procedures. In regard to the setting of rates, HRS § 269-16 requires that all rates and charges must be "just and reasonable." The "just and reasonable" standard has been upheld as constitutionally permissible, even though no specific formula for determining that which is just and reasonable has been statutorily set. *Federal Power Commission v. Hope Natural Gas Co.*, 320 U.S. 591, 600 (1944); *Federal Power Commission v. Natural Gas Pipeline Co.*, 315 U.S. 575 (1942).

None of the infirmities articulated in the court's opinion in the *Schecter* and *Panama* cases are evident in this case. We also find that the Commission's power to order a refund as a condition to an interim rate increase is a valid exercise of its authority to regulate utility rates, provided that the interim rate increase order is itself reasonable under the circumstances of the case. *See Trans Alaska Pipeline Rate Cases, supra; Southern Bell Telephone & Telegraph Co. v. Bevis, supra; State ex rel. Utilities Commission v. Morgan*, 16 N.C.App. 445, 192 S.E.2d 842 (1972); *State ex rel. Puget Sound Navigation Co. v. Department of Transportation of Washington, supra.*

B.  WHETHER ORDER NUMBER 3852 IS VOID BECAUSE THE COMMISSION FAILED TO HOLD A "FULL HEARING" AS REQUIRED BY HRS § 91-9.

HRS § 91-9(a) provides that in contested cases, "all par-

ties shall be afforded an opportunity for hearing after reasonable notice.'' HRS § 91-9(c) provides that ''opportunities shall be afforded all parties to present evidence and argument on all issues involved.'' Appellant claims that the hearing afforded appellants was ''half-a-hearing'' and that the Commission permitted the interim rate increases to become effective before it found that such rates were ''just and reasonable.''

A ''full hearing'' as defined in the *New England Divisions Case*, 261 U.S. 184 (1923), is ''[o]ne in which ample opportunity is afforded to all parties to make, by evidence and argument, a showing fairly adequate to establish the propriety or impropriety, from the standpoint of justice and law, of the step asked to be taken . . . .'' *Id.* at 200. In *McManus v. Civil Aeronautics Board*, 310 F.2d 762 (2d Cir. 1962), the court said:

> ''A hearing may be a full one, although evidence introduced does not enable the tribunal to dispose of issues completely or permanently, and although the tribunal is convinced, when entering the order . . . that, upon further investigation, some changes in it will have to be made.''

*Id.* at 763.

Our review of the record shows that Order No. 3852 was not issued until after all parties had been given ample opportunity to obtain and present all their evidence, to present testimony, both written and oral, to cross examine witnesses, and to argue the issues on the merits before the Commission. The Commission held two days of hearing on the applicant's proposed energy rate adjustment clause (3/15/74 and 4/16/74) and 8 days of hearings on the November 9th application, as amended, for rate increases prior to issuing its interim order.

We find that appellant in this case was afforded a full and fair hearing prior to issuance of the Commission's Order No. 3852. *See Federal Power Commission v. Natural Gas Pipeline Co., supra; Williams v. Washington Metropolitan Area Transit Commission*, 415 F.2d 922 (D.C.Cir. 1968); *McManus v. Civil Aeronautics Board, supra. But cf. State ex rel. Utilities Commission v. Morgan, supra*, where the court held a full hearing was not required prior to commission withdraw-

ing its suspension order on new rate schedules.

C.  WHETHER ORDER NO. 3852 IS INVALID BECAUSE IT LACKS SPECIFIC FINDINGS OF FACT AND CONCLUSIONS OF LAW AS REQUIRED BY HRS § 91-12.

Although we have held that the Commission has the authority to permit utilities to order interim rate increases, conditioned on a refund provision and pending final determination of permanent rate increases, this does not mean that the Commission may do so without making findings of fact and conclusions of law as required by HRS § 91-12. HRS § 296-16 does not make a distinction between permanent and temporary rates, but requires that the Commission determine that *all* rates be "just and reasonable" before being validly approved. Hence, HRS § 91-12 is applicable to interim orders. *In re Hawaiian Telephone Co., supra. Accord, American Smelting and Refining Co. v. Federal Power Commission, supra; Payne v. Washington Metropolitan Area Transit Commission*, 415 F.2d 901 (D.C. Cir. 1968), where the court held it was not necessary for the commission to make full and complete findings when issuing interim rate increases.

In *In re Terminal Transportation, Inc.*, 54 Haw. 134, 504 P.2d 1214 (1972), we held that the Commission's failure to rule on each of the findings proposed by the competing carriers as required by HRS § 91-12 invalidated the Commission's actions. We said at 54 Haw. 139, 504 P.2d 1217:

> [T]he agency must make its findings reasonably clear. The parties and the court should not be left to guess, with respect to any material question of fact, or to any group of minor matters that may have a cumulative significance, the precise finding of the agency.

As the court in *Central Railroad Company of New Jersey v. Department of Public Utilities*, 7 N.J. 247, 261, 81 A.2d 162, 169 (1951), said:

> "The requirement of findings is far from a technicality and is a matter of substance. It has been said that it is a fundamental of fair play that an administrative judgment

express a reasoned conclusion. [Citations omitted.] A conclusion requires evidence to support it and findings of appropriate definiteness to express it. . . ."

In *Saginaw Broadcasting Co. v. Federal Communications Commission*, 96 F.2d 554 (D.C.Cir. 1938), the court said at 560:

[F]indings of fact, to be sufficient to support an order, must include . . . the basic facts, from which the ultimate facts in terms of the statutory criterion are inferred. It is not necessary for the Commission to recite the evidence, and it is not necessary that it set out its findings in the formal style and manner customary in trial courts. It is enough if the findings be unambiguously stated, whether in narrative or numbered form, so that it appears definitely upon what basic facts the Commission reached the ultimate facts and came to its decision.

Even though there may be evidence on the record to support a conclusion that an interim increase in rates as implemented by the rate schedule presented by the PUD is "just and reasonable", this does not excuse the Commission from its duty to make findings as the result of the consideration of the evidence, *Saginaw Broadcasting Co. v. Federal Communication Commission, supra.*

In this case, the Commission's Order No. 3852 contained no separate findings of fact nor conclusions of law other than a statement of the ultimate decision of the Commission to grant the applicant an interim increase, "based on the rate schedule designed by Gaylord H. Ching as shown on pages 47 through 54. . . ." This is not adequate to meet the mandates of HRS § 91-12 nor to aid us in appellate review of the Commission's order. *Horner v. Criminal Injuries Compensation Commission*, 54 Haw. 294, 506 P.2d 444 (1973).

HRS § 269-16 requires not only that the Commission find that the proposed rates are just and reasonable, but also that it "do all things . . . which are necessary" in the exercise of its rate-making power. Hence, the Commission is required to make findings of basic facts which would support a finding that an interim relief order is "necessary." *See American*

*Smelting and Refining Co. v. Federal Power Commission, supra.*

Although interim Order No. 3852 is unsupported by findings of fact and conclusions as required by HRS § 91-12, this court is authorized to remand the cause to the Commission for further proceedings, HRS § 91-14(g), and require the Commission to make appropriate findings. *In re Hawaiian Telephone Co., supra; In re Terminal Transportation, Inc., supra.* In remanding a cause of action brought before the National Labor Relations Board, the United States Supreme Court said:

> It is familiar appellate practice to remand causes for further proceedings without deciding the merits, where justice demands that course in order that some defect in the record may be supplied. Such a remand may be made to permit further evidence to be taken or additional findings to be made upon essential points. . . . The jurisdiction to review the orders of the Labor Relations Board is vested in a court with equity powers, and while the court must act within the bounds of the statute and without intruding upon the administrative province, it may adjust its relief to the exigencies of the case in accordance with the equitable principles governing judicial action. The purpose of judicial review is consonant with that of the administrative proceeding itself, — to secure a just result with a minimum of technical requirements. . . .

*Ford Motor Co. v. National Labor Relations Board,* 305 U.S. 364, 373 (1939). "A remand is proper where an agency has made invalid, inadequate or incomplete findings." *McQuay v. Delaware Alcoholic Beverage Control Commission,* 338 A.2d 129 (Del. 1975). *See also, Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156 (1962); *Colorado-Wyoming Gas Co. v. Federal Power Commission,* 324 U.S. 626 (1945); *Rhode Island Consumers' Council v. Smith,* 111 R.I. 271, 302 A.2d 757 (1973); *Central Railroad Co. of New Jersey v. Department of Public Utilities, supra; Petition of New England Telephone & Telegraph Co.,* 115 Vt. 494, 66 A.2d 135

(1949); *Edison Light & Power Co. v. Driscoll*, 21 F.Supp. 1 (D.C.Pa. 1937).

Since we have no basis on which to review the interim rate increase order, we do not reach the issue of whether the order was supported by reliable, probative and substantial evidence on the whole record and, therefore, remand the matter as hereinafter stated in the conclusion of the opinion.[15]

II. WHETHER ORDER NUMBER 4084 IS VOID BECAUSE THE ULTIMATE CONCLUSIONS REACHED BY THE COMMISSION ARE UNSUPPORTED BY RELIABLE, PROBATIVE AND SUBSTANTIAL EVIDENCE.

HRS § 91-14(g)(5) of the Hawaii Administrative Procedures Act provides, *inter alia*, that upon review of the record, the court may remand the case for further proceedings if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are "clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record." Under the clearly erroneous standard, the court will reverse an agency's findings if the court is left with a "definite and firm conviction that a mistake has been made." *DeFries v. Association of Owners, 999 Wilder*, 57 Haw. 296, 302, 555 P.2d 855, 859 (1976); *De Victoria v. H & K Contractors*, 56 Haw. 552, 558, 545 P.2d 692, 697 (1976). Under this standard, the reviewing court is given greater leeway to reverse an agency's findings than under the former substantial evidence test. The court will reverse "if the findings . . . are against the clear weight of the evidence . . . *even though there is evidence* [supporting the findings] *that by itself, would be substantial*." (Emphasis in original.) *DeFries v. Association of Owners. supra* at 303.

---

[15] We note here that in the cases in which courts have ruled on the question of the propriety of granting interim increases in rates, most jurisdictions have held that merely because a utility company is unable to obtain a rate of return which was authorized by a previous order by a public service commission, this does not render the existing rates as prima facie unreasonable and unjust. State ex rel. Laclede Gas Co. v. Public Serv. Com., 535 S.W.2d 561 (Mo. App. 1976), Payne v. Washington Metropolitan Area Transit Com., *supra. See also* Sixty Wall Tower, Inc. v. Public Service Com., *supra;* New England Div. Cases, *supra*.

The rule is that the burden is always on the applicant to prove justification for a requested increase before the Commission. *In re Application of Hawaiian Electric Co., Ltd.*, 56 Haw. 260, 270, 535 P.2d 1102 (1975). However, once the Commission has made an order, the order carries a presumption of validity and one seeking to upset the order carries "the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences." *Federal Power Commission v. Hope Natural Gas Co., supra* at 602; *Honolulu Gas Co. v. Public Utilities Commission,* 33 Haw. 487, 521-22 (1935), where the court said that the findings of the Commission are presumed to be "reasonable, lawful, and correct." *Pacific Telephone and Telegraph Co. v. Public Utilities Commission,* 62 Cal.2d 634, 646, 44 Cal. Rptr. 1, 8, 401 P.2d 353, 360 (1965); *State ex rel. Laclede Gas Co. v. Public Service Commission,* 535 S.W.2d 561, 570-71 (Mo. App. 1976), where the court held that Laclede Company had failed to carry its burden of proof on appeal to "show by clear and satisfactory evidence that the determination of the Commission was unreasonable or unlawful."

Appellant contends that the applicant has failed to carry the burden or proving that its rate structure is just and reasonable because it failed to present credible evidence to support its application. Specifically, appellant points out that the PUD's expert witness, Harold Honda, questioned the fact that Citizen's 5-year average rate of return from 1969 to 1973 was greater than the average of the sum of the rate of returns for 9 of its subsidiary utility companies for the same period. We note that applicant provided the Commission with the data requested by the PUD on rates of return on invested capital for Citizen's nine subsidiaries. Assuming that the mathematical averaging of these figures would not equal Citizen's overall average rate of return, we fail to see how this is relevant to the issue of the Commission's ultimate determination of a reasonable rate of return for the applicant. There is no evidence that the Commission based its ultimate decision on Citizen's average rate of return.

Appellant further argues that applicant's transmission

and generation systems were inadequate. There was conflicting testimony on this point. As we said in *Mitchell v. BWK Joint Venture*, 57 Haw. 535, 549, 560 P.2d 1292, 1300 (1977), the issue of credibility is within the primary responsibility of the state agency as fact finder, and its determinations will not be disturbed lightly. *De Victoria v. H & K Contractors, supra,* 56 Haw. at 559, 545 P.2d at 698.

In our opinion, the Commission did not act unreasonably in accepting the audit statement by Peat, Marwick & Mitchell for Citizen's Utilities Company and not demanding a separate audit of the applicant. Although we think a separate audit would have been desirable, we cannot say that the absence of the data renders the Commission's findings unjust and unreasonable.

## A. *Rate Base*

HRS § 269-16 requires that the Commission regulate the return upon the public utility property, "all of which shall be just and reasonable, and shall provide a fair return on the property of the utility actually used or useful for public utility purposes." We defined rate base as: "[t]he present value of the property, both tangible and intangible owned by the company used and useful in its utility operation which is to be fairly determined. . . ." *Honolulu Gas Co. v. Public Utilities Commission, supra* at 493-94. In that case, we recognized that the Commission, in ascertaining the value of the property, may adopt any one or all of three theories of valuation: (1) "reproduction cost depreciated," (2) "original cost depreciated," and (3) "earning value." We said that no one formula or set of formulas for determining a rate base can be considered exclusive. Each case necessarily depends on its particular facts.

It has been said that of the three methods, the original cost method of plant valuation provides the most equitable regulation basis for both the consumer and the utility. *Nichols & Fields, Rate Base Under PURA: How Firm A Foundation,* 28 Baylor L. Rev. 861, 865 (1976). The Commission's use of the original or historical cost method is not unreasonable under

the circumstances of this case.

Appellant objects to the Commission's determination of a rate base of $17,374,400 on the ground that the rate base was based on an over valuation of applicant's assets. Appellant's witness, Otto Bixler, testified that because of the "motley origin" of applicant, a historical cost basis of valuation would not be a good basis for valuation, and a proper study should be done to establish the "real original service value" of applicant's plant.

Mr. Walden, PUD's witness, testified that the value of applicant's plant in service was derived from the historical records of applicant, and not from an actual field inspection. To these historical costs, 1974 and 1975 costs for additions to the plant were added. After a field inspection of these additions to applicant's plant the PUD determined which of applicant's 1974 and 1975 costs were reasonable to include in the rate base. Hence, the PUD arrived at a plant in service estimated figure of $24,179,200 for December 31, 1974, and $26,728,900 for December 31, 1975. Mr. Walden's written testimony on fuel oil and purchase power expense included data on purchase power contracts held with the Lihue, McBryde, Grove Farm, and Kekaha sugar mills. On direct examination, Mr. Walden testified that in determining the availability of purchased power in his propositions, he did take into account the availability of hydro and bagasse power at Olokele sugar mill. In calculating the rate base, PUD's witness, Kuichi Okumura, relied on Walden's figures and those of other PUD witnesses.

Viewing the testimony presented by PUD's witnesses as well as the testimony presented by applicant's expert witness, we do not find any clear error in the conclusion reached by the Commission as to the valuation of applicant's rate base.

## B. *Rate of Return*

Appellant claims that the 8.94% rate of return awarded to applicant was based on erroneous economic projections; that

granting a rate of return higher than the 6.5% allotted to applicant at a prior rate proceeding would remove the incentive to lower fuel costs and upgrade services; that the quality of service did not warrant raising applicant's rates.

The Commission determined that the return on equity which the applicant would achieve at an 8.94% rate of return would be 12%. The Commission concluded that no greater return on equity was needed for two reasons: (1) the applicant would not be financing new projects in the forseeable future, and (2) there was a noticeable decrease in applicant's use of purchased power over the past 6-7 years, and by purchasing more of its power instead of generating power using expensive fuel oils, applicant could improve its return on equity, presumably, over and above the 12%.

The Commission accepted the PUD's determination that applicant's projected revenues in 1975 at present rates would be $8,028,800. It accepted the PUD's determination that applicant's projected expenses would total $8,377,500. The Commission concluded that by approving an 8.94% rate of return on a rate base of $17,374,400, the result would be an annual sales revenue increase of $1,949,100.

In *Honolulu Gas Co. v. Public Utilities Commission, supra,* we were confronted with the issue of reviewing the commission's order setting a 7½% rate of return for the utility company. We said:

> There is no particular rate of compensation which must in all cases be regarded as fair earnings for capital invested in business enterprises. Locality, risks incurred and prevailing local rates on similar investments are all factors to be considered. Fair return is the percentage rate of earnings on the rate base allowed the utility after making provision for operating expenses, depreciation, taxes and other direct operating costs. . . . Fair return in something over and above the usual interest rate on well-secured loans to compensate for the risks and hazards of business and for the profits of management.

*Honolulu Gas Co. v. Public Utilities Commission, supra* at 518-19. In a subsequent case, *In re Application of Hawaiian Electric Co.,* 42 Haw. 233 (1957), we subscribed to the test of

reasonableness articulated by the United States Supreme Court in *Federal Power Commission v. Hope Natural Gas*, 320 U.S. 591, 602 (1944), that as long as the "total effect" or "end-result" of a rate order cannot be said to be unjust and unreasonable, then "judicial inquiry is at an end."[16] In the *Hope* case, the United States Supreme Court said:

> The rate-making process . . . the fixing of "just and reasonable" rates, involves a balancing of the investor and the consumer interests. Thus we stated in the Natural Gas Pipeline Co. case that "regulation does not insure that the business shall produce net revenues." [Citation omitted.] But such considerations aside, the investor interest has a legitimate concern with the financial integrity of the company whose rates are being regulated. . . . By that standard the return to the equity owner should be commensurate with returns on investments in other enterprises having corresponding risks. That return, moreover, should be sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and attract capital. . . .

*Id.* at 603.

Since the Commission adopted the PUD's proposal of a fair rate of return, we conclude that it adopted the PUD's method of determining the applicant's rate of return. Harold Honda testified that since the applicant had no capital structure of its own, the capital structure of Citizen's Utilities would be a useful guide in determining the fair rate of re-

---

[16] In reviewing the "just and reasonable" standard, the court in Federal Power Com. v. Hope Natural Gas Co., *supra*, said at 602-03:

> [W]hen the Commission's order is challenged in the courts, the question is whether that order "viewed in its entirety" meets the requirements of the Act. [Citation omitted.] Under the statutory standard of "just and reasonable" it is the result reached not the method employed which is controlling. [Citations omitted.] It is not theory but the impact of the rate order that counts. If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry . . . is at an end. . . .

turn.[17] In Attachment 32 of Staff Exhibit C, Mr. Honda calculated the weighted cost of capital of Citizens Utilities as of December 31, 1973, on three bases: (1) the actual capital structure of Citizens; (2) the capital structure after an adjustment was made for the sale of $35 million in bonds, the borrowing of $17,500,000 of bank loans and an increase in equity of $10,303,000, and (3) a "normalized" capital structure, imputing a hypothetical capital structure to Citizens of 8.8% preferred stock. Under the actual and adjusted capital structure, the weighted capital cost of Citizens would be 9.84% and 9.73%, respectively. Under the "normalized" capital structure, the weighted cost of capital would be as follows:[18]

| | CAPITAL STRUCTURE | CAPITAL COST | WEIGHTED CAPITAL COST |
|---|---|---|---|
| Debt | 53.4% | 7.24% | .038662 |
| Preferred | 8.8% | 6.00% | .005280 |
| Common | 37.8% | 12.00% | .045360 |
| | | | .089302 or 8.93% |

Mr. Honda determined that, although Citizens consistently earned a high return on common equity, up to 16% in the years 1972-73, in looking at what other electric, telephone, and water companies were earning and what industries in the competitive segment of the economy were realizing, 12% return on common equity was reasonable for cost of capital purposes for Citizens Utilities. The average return on common equity of 10 electric companies of a 5-year period, from 1969-73, was 11.78%, whereas, for Citizens, it was 15.35%. For all other industries, the median return on equity capital from 1972-73 were 10.3% and 12.4%, respectively.

---

[17] See Foster, Fair Return Criteria and Estimation, 28 Baylor L. Rev. 883 (1976), for a discussion on the consolidated capital structure approach to determination of a fair rate of return when an operating company is wholly owned.

[18] See Butler, The Rate of Return in Texas — The Neglected Issue, 28 Baylor L. Rev. 937 (1976), for an explanation on the determination of the rate of return on the basis of weighing: (1) interest on debt, (2) dividends on preferred stock, and (3) earnings on common equity.

Based on the record before us, and on the criteria set down by the United States Supreme Court in the *Hope* case, we cannot say that the Commission's conclusion was clearly erroneous.

Appellant claims that the Commission's failure to consider the question of efficiency in the operation of the utility as a factor in setting the fair rate of return. Although efficiency is a factor to be considered by the Commission in setting a fair rate of return, *State ex rel. Southwestern Bell Telephone Co. v. Public Service Commission*, 262 U.S. 276, 291 (1923), and a commission may take cognizance of inefficient management in fixing a rate of return, *Nichols & Welsh*, Ruling Principles of Utility Regulation (Suppl. A, 1964), we find little in the record which would support a finding that applicant was inefficient in its management of the utility. There was testimony by appellant's witness that in 1969, the quality of service by the applicant was poor. However, on direct examination, Mr. Harold Heidrick, vice president of the engineering firm of Wilsey & Ham and a registered professional electrical engineer who conducted the feasibility study for the County of Kauai in 1972, testified that there had been an upgrading of operations since 1969. Also, this witness testified that, although line losses for applicant was slightly over 10% for 1973, considering the applicant's origin, 10% was a reasonable line loss. In the written testimony, Otto Bixler admitted that although there is a strong possibility that 1968 in service utility plant estimated value may have been overstated as much as 25%, this was conjecture. Mr. Bixler said that without an opportunity to review an itemized utility plant inventory, it would not be possible to determine the remaining functional life of the plant.

On the issues discussed herein, the record clearly supports the Commission's findings and conclusions in final order No. 4084.

III. WHETHER THE ENERGY CLAUSE IS VOID.

The appellant does not contend that the PUC failed to

make the necessary findings of fact and conclusions of law in final order No. 4084 on this issue. However, the appellant contends that the energy clause is invalid because it is designed to create profits for the appellee and because rules and regulations are lacking for notifying the public of rate increases. Appellant further contends that procedures are lacking for monitoring the formulas so that serious inequities and overbillings could occur.

The energy clause which was adopted by the Commission in interim order No. 3852 and final order No. 4084 was essentially that energy clause proposed by the PUD at the show cause hearings in April, 1974, and put into effect by the Commission at its April 16, 1974, quorum meeting.[19] The testimony of Mr. LeRoy Yuen regarding the PUD's proposed clause established that the purpose of an energy clause was to recoup only the cost of fuel and not to create profits for the utility company or to bring in revenues sufficient to permit the utility company to meet its authorized rate of return. There is no support on the record for appellant's contention that the energy clause, as adopted, was designed to create profits for the applicant.

Appellant seeks to void the energy clause on the basis that rules and regulations are lacking for notifying the public of rate increases. This argument is without merit. HRS § 269-16 mandates that notice and hearing be afforded to the public and to the parties before rate increases can be implemented. Assuming, *arguendo,* that the energy clause as authorized by the Commission constituted a "rate increase" within the meaning of HRS § 269-16, in the present case, such notice and hearing was given prior to the Commission's final order. There is no statutory provision which requires the Commission to promulgate additional rules in order to authorize rate increases.

Appellant argues that serious inequities and overbilling "could" occur in the future. Whether such inequities could

---

[19] The intervenor was present at the April, 1974, public hearings at the time PUD's proposed energy clause was presented. The intervenor made no objections to the clause.

occur or not is irrelevant to the present appeal. Appellant has failed to show that the energy clause as approved by the Commission in this case is unjust and unreasonable. We note that should the rate schedules as approved by the Commission in its final order become unjust and unreasonable in the future, the appellant will have recourse to complain to the Commission pursuant to HRS §§ 259-7 and 15. The appellant would also have recourse to complain to the newly created consumer advocate as provided for in HRS §§ 269-51 through 55.

IV. WHETHER DENIAL OF APPELLANT'S MOTION TO REOPEN THE PROCEEDINGS DENIED THE CONSUMER A FAIR HEARING.

It has been consistently held that rehearings before administrative bodies are addressed to their own discretion, and "[O]nly a showing of the clearest abuse of discretion could sustain an exception to that rule." *United States v. Pierce Auto Freight Lines, Inc.* 327 U.S. 515, 535 (1946). *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281 (1974); *Radio Corporation of America v. United States*, 341 U.S. 412 (1951).

In our opinion, appellant has failed to sustain its burden of showing that the Commission clearly abused its discretion by demanding a separate audit of appellee, or by failing to require a more detailed explanation of appellee's item of "unallocated incomes" in its accounts. "Ordinarily, a petition for rehearing is for the purpose of directing attention to matters said to have been overlooked or mistakenly conceived in the original decisions and thus invites a reconsideration upon the record upon which that decision rested." *Atchison, Topeka & Santa Fe Railway Co. v. United States*, 284 U.S. 248, 260 (1932) (rehearing granted). The need for the additional information requested by appellant was not overlooked but considered unnecessary to the Commission's final decision. As stated by the court in *Olivieri v. City of Bridgeport*, 126 Conn. 265, 10 A.2d 770, 772 (1940):

In the absence of other controlling circumstances, the

> ultimate question for the determination . . . is whether it appears likely that an injustice has been done and upon rehearing a different result would probably be reached. . . .

We are not persuaded that injustice has been done nor that the result reached would have been significantly different had the additional documents been before the Commission.

### CONCLUSION

We affirm the Commission's final order No. 4084. However, order No. 3852 is remanded to PUC for findings of facts and conclusions of law pursuant to the requirements of HRS § 91-12, while this court retains jurisdiction of the case.

*Arthur E. Ross*, Deputy County Attorney, County of Kauai, for appellant, County of Kauai.

*James H. Case and Robert E. Strand (Carlsmith, Carlsmith, Wichman and Case* of counsel) for applicant appellee, Kauai Electric Division of Citizens Utilities Company.